*1083 OPINION.
Opper :
It has been frequently asserted that solution of the question presented here — whether a distribution in partial liquidation is such in time and manner as in substance to approximate a dividend — must rest upon the particular facts of each individual case. E. M. Peet, 43 B. T. A. 852. It is thus of less than the usual value to attempt an extended discussion of the precedents. Even the general *1084 rules established are no more dispositive than the language of the statute[1] itself.
All that may be, done is to examine with care the circumstances surrounding the transaction for the purpose of determining the extent of essential equivalence, which is the only test the statute describes. It is sometimes urged, as petitioners do here, that our attention should be focused on the original issuance of the stock and not on its redemption, so that if we can find no scheme or plan relating the two, the equivalence must be absent without further investigation. See Patty v. Commissioner (C. C. A., 2d Cir.), 98 Fed. (2d) 117. Even this helpful simplification of the problem, however, is unacceptable, since the rule of the Patty case has been found to be too broad for adoption by other courts or by this Board. See e. g. Annie Watts Hill, 27 B. T. A. 73; affd. (C. C. A., 4th Cir.), 66 Fed. (2d) 45; L. B. Hirsch, 42 B. T. A. 566; J. Natwick, 36 B. T. A. 866; Flanagan v. Helvering (App. D. C.), 116 Fed. (2d) 937; E. M. Peet, supra.
One of the tests which is more favored is whether the redemption was apparently dictated by the reasonable needs of the business or whether, on the other hand, it originated with or was designed for the benefit of the stockholders who received its fruits. W. & K. Holding Corporation, 38 B. T. A. 830; Flanagan v. Helvering, supra. Cf. Henry B. Babson, 27 B. T. A. 859; affd. (C. C. A. 7th Cir.), 70 Fed. (2d) 304; certiorari denied, 293 U. S. 571; Bona Allen, Jr., 41 B. T. A. 206. It is true that most, if not all, of the cases applying that test have found other circumstances as well to support the result. But essentially we think the test applicable by its own weight and that if applied it will be decisive of the present controversy.
Without reiterating in detail the circumstances surrounding the redemption, which appear fully in the findings of fact, it is we think sufficient to quote here a portion of petitioners’ proposed findings which seem to us to summarize fairly the immediate background of the transaction:
* * * there was considerable apprehension on the part of the Clayburghs [petitioners] with respect to the large indebtedness of Mr. Clayburgh to the corporation representing monies loaned to him over a period of years, only a part of which had been repaid. (Stip. par. xvi) This presented a constant threat to Mr. Clayburgh’s investment which Mr. Ackerman [the Clayburghs’ lawyer] felt should be eliminated and resulted in his proposal that Leo J. Clayburgh surrender sufficient preferred stock to satisfy this indebtedness.
*1085 After further negotiations a plan was evolved which * * * provided first for the redemption of 25% of the outstanding preferred stock, the redemption price to be applied first in each case to the satisfaction of the stockholder’s indebtedness to the company, * * *
It thus appears that the initiative for the redemption in question originated with the stockholders who were to receive the distribution ; and that its purpose was primarily to benefit them by furnishing a means of paying off their debts to the corporation.
Petitioners’ proposed findings also assert that “in determining the amounts of the reduction to be made in the preferred stock there was taken into consideration the amount of capital required by the business as well as the amounts necessary to discharge the indebtedness of stockholders to the corporation.” This may be so as far as it goes, but an examination of the record demonstrates that the consideration given to the needs of the business was a negative and not an affirmative factor. There is nothing to indicate that those actively interested in the corporation’s management were proponents of the redemption plan.[2] Their concern was merely to safeguard the venture by assuring that the plan, if agreed to, would not unduly weaken the corporation’s capital structure. This supplies the distinction from such cases as Bona Allen, Jr., supra.
If the indebtedness, which struck the stockholders as so precarious that a means should be found to pay it, had been merely forgiven by the corporation, it is clear a taxable dividend to the stockholders would have been the result. Allen v. Commissioner (C. C. A., 1st Cir.), 117 Fed. (2d) 364. And cf. William C. Huntoon, 14 B. T. A. 459. That course was impossible here for two reasons. The first was that the debtor stockholders were not the only interested parties. Any plan designed to cancel the indebtedness had at the same time to preserve the interests in the corporation of all of the stockholders in their proper proportions. This result the pro rata redemption of the preferred stock accomplished. The second difficulty was that there was at the time no surplus available for distribution. This, however, was due in part to an earlier capitalization of earnings, which took the form of a reorganization of a predecessor company, “the effect” of which, as petitioners observe in their brief “is recognized to be the same” as a stock dividend. And see Commissioner v. Sansome (C. C. A., 2d Cir.), 60 Fed. (2d) 931; certiorari denied, 287 U. S. 667. This absence of available surplus could be overcome, as it was, by reversing the process of capitalization and freeing the captured earnings for distribution to the stockholders *1086 by means of redeeming the stock which had originally capitalized them.
Both of the factors, therefore, which characterized the plan in its final form were those which are familiar in situations of this kind, and which emphasize rather than dim the aspect of a dividend. That the distribution was pro rata to the stockholders is one of the characteristics of cases found to fall within the section. See 49 Harvard Law Review, 134T. And that a taxable distribution may involve a reversal of the process of capitalization of earnings is a possibility which the parenthetical phrase at the opening of the section itself recognizes. Giving full weight to the origin, purpose, and development of this redemption, we think the circumstances as a whole bring it within the terms of section 115 (g) and that it was, considering its time and manner, essentially equivalent to the distribution of a taxable dividend. J. Natwick, supra; L. B. Hirsch, supra; William C. Huntoon, supra; Flanagan v. Helvering, supra.
It is true there were other phases of corporate action taken at the same time which were quite clearly dictated by the necessities of the corporation’s position. Elimination of the cumulative provision of the preferred stock, renunciation by the stockholders of the accumulated preferred dividends, and reduction of a nonessential salary item fall into that category. But none of these steps was connected, except indirectly, with the stock redemption. They could have been accomplished! without it and by themselves they would not have achieved the purpose sought by redeeming the stock. It is that phase of the entire transaction with which we are concerned and as to that the other aspects mentioned are insufficient to overturn the considerations already discussed.

Decision will be entered under Rule 50.

 SEC. 115. [Act 1936.] DISTRIBUTIONS BY CORPORATIONS.
[[Image here]]
(g) Redemption op Stock. — If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at, such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.
[[Image here]]

 The witness Epstein, manager and moving spirit of the corporation, testified on cross examination:
“The part of the plan was to — the consideration was that by doing this we would accomplish the liquidation of the monies that were owed by the parties mentioned.”